Good morning, Your Honors. My name is Todd Grover. I represent the appellant, Marshall Richmond. It's my intention this morning to start out by making a few of the key points that I've made in my briefs that I will then, with the court's permission, ask to reserve a few moments for rebuttal if necessary. Your Honor, we're here this morning because Marshall Richmond, in this criminal case, has received a 15-month, or pardon me, 15-year prison sentence, but he has not yet received a full and fair opportunity to defend himself. I can state the problem another way, and that is that the accuracy of the verdict in this case is questionable because the jury that rendered that verdict heard only half the evidence. Before I descend to particulars, Your Honors, let me put the case in a little bit of context for us this morning. It is undisputed that in June and July of 2003, a paid police informant, a gentleman by the name of Jerry Garner, made six controlled purchases of cocaine from a residence here in Portland. Those buys, if you will, culminated in the execution of a search warrant at that residence, and when the police went into the house, they discovered my client, Marshall Richmond, asleep in a bed, and on the headboard of that bed, or in the bedroom. If I may, just to get to the part of the case that I wanted to ask you about, and that is the question of harmless error. Let's assume that the letters purportedly from the alcohol had been admitted. I'm not sure I understand what difference that would have made in view of the fact that the drugs in the headboard were not part of the charged crime, that it was the drugs from the controlled buys, and because of the controlled buys, the evidence was overwhelming against your client. So, if you would address that point, I'd appreciate it. Certainly. First of all, the 22.1 grams that were found in the headboard actually constitute the corpus of count seven. My client was charged with seven different counts. Count seven was that my client possessed with intent to not be harmless, in my view, as to count seven. On that particular count, before I leave the point and discuss how it affects the remaining counts on the indictment, Your Honor, the evidence of my client's possession of those drugs was entirely circumstantial. There was no direct evidence that my client possessed them. In fact, he denied possessing those drugs when questioned by police. The government's case for my client's possession of those drugs was based almost entirely just on, frankly, his proximity to the drugs when the police entered the bedroom, as well as the fact that... Really, you'd have six counts with the same sentence, so you'd have a nice theoretical victory if you eliminated one count, but I think you'd be more interested in what would affect all of them. Sure. Let me answer. I'm sorry to interrupt you. I think answering Judge Graber's question is important. Why would a jury's verdict likely to be affected in view of the other evidence if they had seen these letters? It would be the difference, Your Honor, between a trial in which the defendant placed or had put on some defense and the trial that we had in this case, which is my client had no defense. It was my client's theory of defense and what he intended to prove at trial was that somebody else associated with the residence was the drug dealer who was consistently selling drugs to the paid informant, Jerry Garner. And my client attempted to establish that in two ways. He did it through cross-examination of some of the officers who surveilled and watched these during the period of most, if not all, of these other controlled buys, other people that the officers actually saw, who knows who was actually in the house. Was Judge the putative author of these letters at the residence when the officers were there? Yes. When the search warrant was executed on July 8th and 22.1 grams were located, he was found sleeping in the house, Your Honor. Because he claims the Fifth Amendment, so he can't vouch for these letters. So what makes those letters trustworthy? I assume I'm sitting there as a district judge and you're trying to get those letters before the jury, and I'm a little suspicious about the authorship and the motivation and the contents of the letters. And so I want to be assured that this is a trustworthy hearsay. Get some nice exception to the hearsay rule. Certainly. Four points in particular make them trustworthy, four major points, and then there's some minor stuff we can touch on later. First is, Henry Johnson is, as I just said, in the residence at the time that the drugs were actually found. It's present. Secondly, after the arrest, he makes these admissions in these letters to his nephew, Marshal Richmond, saying the drugs are mine. These are statements against penal interest which have long been recognized to be reliable, trustworthy, the sort of thing that's- Reliable, they're constantly claiming the pistol belongs to them when their husband is the ex-convict in charge of the depression. Does that make it trustworthy? Not standing alone, but I ask you to consider this collectively with the other points I'm about to make. So there's the presence, there's the fact that he twice makes these statements against penal interest. There is something, and I think this is the most important point for us to take home, is the statement that is really at issue is Henry Johnson in his letters saying, I'm sorry, you're probably hotter than fish grease on a Friday night for me leaving my drugs in the headboard of your bed. In that statement, he evinces an insider's knowledge of precisely where those drugs- But does he say in the letter, I was the one who made the other six sales, not you? No, he doesn't, Your Honor, and I would like to get back and finish addressing the question that you raised in your concern about harmless error. But let me finish up by saying what else makes this reliable. The final point, Your Honor, that makes this reliable is that Henry Johnson is then subpoenaed at trial when he ultimately gets there in custody, as it turns out. He invokes the Fifth Amendment and essentially says, my answer may incriminate me, therefore I'm not going to testify. If these weren't his drugs, it would have been very easy for him to get up on the stand and say, these weren't my drugs. He got the advice of counsel and he kept his mouth shut, and I suggest he did that because they were his drugs. Those are the big points, Your Honor, that make this reliable. But let me answer your question. The reason that this is so important and that this is not harmless error is that, as I was saying, Judge, there were two ways that my client was attempting to demonstrate that somebody else was the dealer in question. One was demonstrating that there were always other people, other potential people around who could have been the dealer. And the second was he was going to introduce Henry Johnson's testimony, but Henry Johnson, of course, without this, so he sought to give these letters, without this evidence, Your Honor, what happened in this case is the jury goes back to begin deliberations and they ask themselves, well, you know, the defense has this theory that Marshall Richmond wasn't the dealer. That's great, but if Marshall Richmond wasn't the dealer, who was? Who was? They had no way to answer that question. Now, inject, if you will, the evidence that was, in my view, wrongfully excluded here, Henry Johnson's letters. Suddenly the jury can answer that question. Now they can say to themselves, oh, it looks like Henry Johnson may have been the dealer at issue here. That is a completely different case. Suddenly my client's got a fighting chance during those jury deliberations, whereas previously he did not. All right. Do you want to save your minute and a half? I do. Thank you for reminding me. Thank you. May it please the Court, my name is Jennifer Martin. I'm an assistant United States attorney, and I represent the United States in this case. I want to turn to the Court's questions about the trustworthiness of the two documents, and then I want to go back to the point I made in the brief about the fact that neither document was identified or authenticated. First, to address the Court's question. Why don't we start at the other end for a moment with Judge Graber's question? Certainly, Your Honor. Assume that this was erroneously admitted. Is it prejudicial? No, Your Honor, it is not. The evidence in this case, as I pointed out in the harmless error section of the brief, when examined as a whole, looking at the two documents in the context of all of the evidence, the Court will qualitatively assess what was presented. In this case, there were audio tapes identified as the defendant's voice. There were body wires identified as the defendant's voice, setting up the six previous deals. At the time of the execution of the search warrant, there was a shoe found with several thousand dollars in it. Did the informant testify at the trial? Yes, Your Honor. The defendant was the one from whom he bought the drugs? Yes. The informant testified that the defendant was the person from whom he purchased the drugs on all but one occasion. And on that occasion, he had made arrangements with the defendant to purchase the cocaine. But it was sold by... So you have the informant's testimony, and then you have the voice identification of the defendant by whom? By both the informant and the case officer, Officer Hopper. And then at the time of the execution of the search warrant, purchased money from three of the controlled buys, including the buy that was made from an associate of the defendant's, were found in the defendant's shoe. The defendant claimed ownership of the money in the shoe. In addition, the scale was found in a coat belonging to the defendant. All of the evidence at the point of the execution of the search warrant pointed to the defendant. I noted that in Mr. Grover's response, one of the factors that he mentioned was that Mr. Johnson, who was present at the time of the search warrant, knew where the cocaine was. Well, it was, in plain view, in the defendant's bedroom on the headboard of the bed. That was clearly established by the officers who were executing the search warrant. And as was conceded by defense counsel at the time of the trial, Mr. Johnson could have easily ascertained where the drugs were found since the records were being logged in or received by the evidence custodian in the area where he was present. He could have also seen them in plain view in the house since he was present at the time the search warrant was executed as well. The... And your point there is that it's not intimate knowledge that only the... Yes, Your Honor. ...criminal would have had. Is that what you're trying to get at? Yes, Your Honor. Anyone present at the house at that time would have known that was where the cocaine was located. The admission of these two letters would have had little, if any, effect on the jury's deliberations in this case. The trial court correctly found that they were simply not trustworthy, that they didn't have sufficient corroboration to establish the trustworthiness that this court requires in admitting a statement against penal interest. As the court noted in Legrand v. Stewart, the accused, as is required of the government, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. And just as in Legrand v. Stewart, the court examined the two documents, looked for evidence that both corroborated and contradicted the statement, and in conducting that analysis, found that there was insufficient evidence of corroboration to admit the statements. The court correctly exercised its discretion in excluding the statements. And I want to note, as the court is well aware, that the defense had two opportunities to admit these two letters. First on Friday of the trial week, and then subsequently on Monday. On Friday, the witness failed to appear in accordance with the subpoena. The defense attempted to offer the two letters, even though the witness had failed to appear while the marshals were out attempting to arrest the declarant. And then again on Monday, after the declarant exercised his Fifth Amendment rights against self-incrimination, the defense again attempted to offer the two documents. But at no point did anyone establish any of the circumstances surrounding the transmission or receipt of either document or what either document was, nor did anyone attempt to conduct any type of handwriting analysis that would have satisfied a preliminary identification of the documents, so that they would be admissible. 901A requires a prima facie showing of authenticity so that a reasonable juror could find in favor of authenticity or identification. Neither of these documents were identified or authenticated. Only defense counsel described the documents as letters. There was no evidence of transmission or receipt. No one described them as letters. No one described the source of the documents, the circumstances of their mailing, the delivery or the receipt or the authentication of the handwriting. While I have been unable to find a case in this district that directly addresses this point, there is a Seventh Circuit case, Mayer v. Angelica, which similarly a proponent offered letters with no authentication. And there the Seventh Circuit found that without proof of authorship, receipt, or evidence that anyone sent or saw the letters, that the admission of the letters in a civil racketeering case was reversible error. The Court should reach the same conclusion simply on issues of identification and authenticity here. Turning to the concerns, though, about trustworthiness, in examining trustworthiness, the Court should look at the time of the declaration, the party to whom it was made, and the existence of corroborating evidence. At this point, the record is silent on the party to whom the statement is actually made or the circumstances in which it was made. We have no information how these letters appeared in defense counsel's hands. Assuming for the moment that the letters are what counsel purports them to be, letters sent from his uncle to the defendant on the dates that they were said to be sent, these are statements that were made months after the event. They were made to the defendant, the proponent of the evidence, and the corroborating evidence, as in Satterfield, is scant. It is outweighed by the contradictory evidence in the record. This case is distinguishable from the two cases the defense counsel relies upon, Chia and Slaughter. In Chia, the defendant, the declarant, made four statements to law enforcement immediately after the crime. At the time when he was undergoing emergency surgery. And in that case, surveillance confirmed aspects of the statements. In this case, the surveillance is at odds with the statements made by the declarant. There is no persuasive assurance of trustworthiness, as there was in Chia. In Slaughter, while there was less evidence than in Chia, the declarant made statements that the government's informants used drugs with the defendant. The statement was made months after the crime, as is the case here, but there was at least some corroborating evidence in the form of the defendant's testimony about what happened at that time. In this case, there is none. Let me ask you just one question. Yes. How much, what was the quantity involved on the head bullet? Twenty-two grams, Your Honor. Is that more than is normally for personal use? Yes, Your Honor. I believe established in the record, a possessory amount of crack cocaine might be a quarter of a gram. I may be mistaken on that, but I believe that the officer testified about what a personal use amount would be in the record. I believe it may be a quarter of a gram, certainly less than a gram. Is that an amount that would ordinarily demonstrate a distribution? Yes. And I believe the trial court relied upon that fact, too. Although, frankly, the record does not indicate that Mr. Johnson was even a drug user, the probation officer indicated that that matter was not clear to him, that the defendant's, that the declarant's wife suspected he might be using, but he had no actual clear understanding of whether or not the declarant was even a drug user. And there was certainly no evidence that Mr. Johnson was a drug dealer of crack cocaine. There was some reference to an article that may have been to the declarant, Mr. Johnson, assuming that it was, that he was a heroin dealer some 30 years earlier. But there was no evidence in the record that Mr. Johnson was involved either in the use or the distribution of crack cocaine. Thank you, Your Honor. Thank you. Your Honor, so I'll touch briefly on a couple of the points made by counsel. First, I'll start off with the authentication issue, and I think this is a simple one, and so I will say a word and then move on. The authentication issue, I believe, is governed by this Court's very recent decision in the United States to be Alvarez-Farfan, which is discussed in both the parties' briefing. As I say, I think that case governs, and I think it governs your decision in this case. Your Honor, moving on to, I want to touch on the facts that counsel just discussed because I want to make sure that we all have a clear understanding of what the record looks like. Counsel talked about the possibility that Henry Johnson, during the morning of the search in this case, may have overheard officers talking about the discovery of 22.1 grams of cocaine in the headboard of the bed or may have personally seen it. I want to make clear there's no evidence in the record that that actually happened. Certainly, that is a theoretical possibility, but there's no evidence that that actually happened. Now, there's also what I'm arguing when I say he's got an insider's knowledge of the location of the cocaine. That's in the record. Now, the inference that I would ask this Court to draw is that, of course, he's got that insider knowledge because he's the person who put it there because it was his cocaine. But I want to make clear there's no evidence that he saw it. And, in fact, it seems unlikely. And if I could... Is there any evidence as to whether there was contact between the defendant and his uncle in the lengthy period of time between the search and the date of the first letter? There's no evidence in the record of any contact between Henry Johnson and Marshall Richmond. Or to the contrary? Or to the contrary, but for the two letters. Okay. So the insider knowledge at the time or not, they presumably could have talked about it as well. They certainly could have. There's no evidence that they did. There's no evidence that they didn't. Of course, it's hard to prove a negative. It's hard to prove that they didn't talk. But there's no evidence that they were in communication. And, Your Honor, and I also want to touch on a point that counsel made in my last few seconds regarding evidence that Henry Johnson was a drug user and drug dealer. I take issue with counsel's position. There is evidence that was offered as part of the offer of proof that in the 1970s that Henry Johnson was known as King H or the King of Heroin in Portland. That was conceitedly in his youth. But his current probation officer testified during the offer of proof that he did suspect that there was a drug use and or distribution issue in this case. And what the probation officer said is those two habits, use and distribution, typically go hand in hand, I believe was the terminology he used. And those were based on reports of the wife, reports from police that Henry Johnson is found in high-drug vice areas in the current day. And so I think there is evidence from which this Court can infer that Henry Johnson did indeed have a drug use and or distribution problem. Thank you. Thank you, counsel. The case is directed to Mr. Kennedy. Next case on the calendar for argument is United States v. Gunnar Krapser.
judges: Goodwin, Reinhardt, Graber